## CIRCUIT COURT OF FAIRFAX COUNTY

MNC Credit Corp.

v.

Ashburton, L.P., et al.

March 27, 1997

Case No. (Chancery) 145429

BY JUDGE ARTHUR B. VIEREGG, JR.

In this cause in equity, MNC Credit Corporation ("MNC") seeks *inter alia* compensatory damages against Charles Sickels and the law firm of Hall, Markle, Sickels & Fudala ("Attorneys") for claims of legal malpractice.[1] Specifically, MNC alleges the Attorneys made mistakes in the preparation of loan documents for Maryland National Mortgage Corporation ("MNMC"), MNC's sister corporation,[2] in connection with a real estate loan transaction. MNC also alleges that MNMC assigned MNC its position in the loan transaction, including any rights of action related to the loan, and therefore, MNC may recover any damages it suffered or, alternatively, any damages suffered by MNMC.

The Attorneys demurred to MNC's initial bill of complaint contending (i) MNC failed to plead a contractual relationship with the Attorneys and, therefore, may not recover damages it has suffered; and (ii) MNC may not recover damages suffered by MNMC because assignments of legal malpractice claims violate public policy and are, therefore, unenforceable. After an earlier hearing, I sustained the Attorneys' demurrer but granted MNC leave to file amended pleadings.

---

[1] In its bill of complaint, MNC also sought injunctive relief against parties other than the Attorneys, but these claims have since been settled. The actions set forth against the Attorneys in Counts IV, V, and VI of the bill of complaint, however, are legal in nature.

[2] The parent of both MNC and MNMC is MNC Financial, Inc. ("MNC Financial").

In its amended bill of complaint, MNC re-pleaded its original causes of action and pleaded additional facts in an attempt to aver it was a third-party beneficiary of the attorney-client agreement made between MNMC and the Attorneys. The Attorneys again demurred. Following oral argument, I took this case under advisement. I am now prepared to rule on the Attorneys' second demurrer.

## I. *Facts Alleged in MNC's First Amended Bill of Complaint*

In its First Amended Bill of Complaint, MNC alleged the following facts which, for purposes of the Attorneys' demurrer, must be accepted as true.

On September 7, 1992, real estate developers Ashburton, L.P., and John Long ("Developers") contracted to buy and develop land located in Fairfax County. The contemplated development required that bonds be posted with Fairfax County and the Virginia Department of Transportation ("VDOT") to ensure certain necessary public improvements would be constructed. The Developers sought financing for the project from MNMC.

In the fall of 1992, MNMC retained the Attorneys to draft the Developers' loan documents. In preparing those documents, the Attorneys were charged with the duty to create an ongoing obligation for the Developers to repay MNMC cash bonds released to them by Fairfax County or VDOT after the bonded public improvements were completed. The loan documents drafted by the Attorneys, in fact, failed to ensure the return of monies to MNMC. The Attorneys were further informed that MNMC might assign its interest in the loan transaction to a related company, such as MNC, or to an unrelated third party.

On April 27, 1993, MNMC posted two cash bonds with Fairfax County totaling $919,000 and a separate cash bond with VDOT of $145,000 as collateral for the Developers' public improvement obligations. On May 28, 1993, pursuant to the terms of an Asset Purchase Agreement, MNMC assigned all of its rights, interests, and obligations in connection with the Developers' loan to MNC.

Between December 8, 1993, and August 18, 1995, Fairfax County released all but $153,000 of the cash collateral posted by MNMC to the Developers. VDOT similarly released its entire $145,000 cash bond to the Developers. Thereafter, MNC made repeated demands for the Developers to repay all monies released by Fairfax County and VDOT. The Developers refused, denying that they were required to do so under the terms of the loan documents drafted by the Attorneys. This litigation ensued.

II. *Analysis of the Attorneys' Demurrer*

A. *The Privity Issue*

The Attorneys contend MNC's First Amended Bill of Complaint is legally infirm for failure to allege a contractual relationship between MNC and the Attorneys. To maintain a cause of action for legal malpractice, a plaintiff must plead and prove each of the following: (1) an attorney-client relationship existed between the plaintiff and defendant; (2) the attorney neglected or otherwise breached a duty owed to the plaintiff; (3) the attorney's breach of duty was a proximate cause of injury to the plaintiff; and (4) the plaintiff sustained actual damages. *Allied Productions, Inc. v. Duesterdick*, 217 Va. 763 (1977).

In order to establish an attorney-client relationship, there must be a contract of employment, either express or implied, between the attorney and the client. *Ewing v. Haas*, 132 Va. 215 (1922). Since MNC does in fact fail to allege that it contracted with the Attorneys for the provision of legal services relating to the Developers' loan, MNC may only recover for damages if MNC is able to plead and prove it was an intended third-party beneficiary of the contract between MNMC and the Attorneys. *See, Copenhaver v. Rogers*, 238 Va. 361 (1989).

While MNC does allege that the Attorneys were aware that MNMC's interest in the loan transaction might be transferred to some other entity, nowhere does MNC plead facts sufficient to show MNMC and the Attorneys intended MNC to be a third-party beneficiary of their contract for legal services. Nor do the loan documents evince such an intention. Thus, even if the allegations in MNC's amended bill of complaint are taken as true, they fail to make out a cause of action for breach of a third-party beneficiary contract.

Having failed to demonstrate that MNC was in privity with the Attorneys, MNC has failed to satisfy the first prong of the *Duesterdick* test. And in the absence of an attorney-client relationship, the Attorneys owed no duty to MNC upon which an action for damages could be based.

MNC seeks to recover damages for its disappointed economic expectations arising out of its purchase of MNMC's interest in the loan; that is, MNC seeks to recover damages equal to the difference between the value of rights MNC thought it was acquiring and the value of the rights it actually acquired. MNC essentially alleges it was damaged because, contrary to its expectations as MNMC's successor-in-interest, it was unable to require the return of the cash posted as collateral for the public improvement bonds. In the absence of privity with the Attorneys, however, such economic losses may not be recovered. *See,*

*Ward v. Ernst & Young*, 246 Va. 317 (1993). Furthermore, since the Attorneys owed no duty to MNC, it is apparent that MNC's damages were caused by MNC's own lack of due diligence in investigating the rights it was acquiring from MNMC.[3] For the foregoing reasons, MNC may not maintain a direct cause of action for legal malpractice against the Attorneys.

## B. *The Assignment Issue*

Since no attorney-client relationship existed between MNC and the Attorneys, MNC's remaining avenue of recovery is as an assignee of MNMC's legal malpractice claim against the Attorneys.

### 1. *Viability of MNMC's Putative Claim on the Date of the Injury*

As *Duesterdick* demonstrates, a necessary element of a cause of action for legal malpractice is that the client must have suffered injury as a consequence of the attorney's errors or omissions. *Duesterdick* at 764-65. In its First Amended Bill of Complaint, MNC alleges the damages suffered arose from the failure of the Attorneys to include provisions in the loan documents requiring the Developers to repay to MNMC or its assigns any monies released to it by Fairfax County or VDOT. However, as the facts alleged demonstrate, those releases occurred at least seven months *after* MNMC assigned its interest in the loan transaction to MNC. Therefore, as of the date of the alleged injury, the client, MNMC, no longer held an interest in the loan, had not suffered damages as a consequence of the Attorneys' alleged errors, and, therefore, could not have assigned any claim to MNC.[4] Since MNC cannot prove that MNMC sustained injury, the Attorneys' demurrer must be sustained as to MNC's attempted enforcement of MNMC's right of action for legal malpractice.

### 2. *Assignability of Legal Malpractice Claims*

The Attorneys also contend that a majority of American courts addressing the issue have held that assignments of causes of action for legal malpractice violate public policy and are therefore unenforceable. The Attorneys rely on

---

[3] MNC, of course, might have recovered for such disappointed financial expectations if it had retained the Attorneys to draft the assignment documents or if it had retained the Attorneys to conduct a due diligence investigation as to the rights it would receive by acquisition of the Developers' loan. Such an undertaking, of course, would have amounted to a contract between MNC and the Attorneys. The existence of such a contract, however, was not alleged.

[4] Of course, MNMC would have suffered injury and therefore might have assigned a viable legal malpractice claim to MNC if Fairfax County and VDOT had released the funds before the assignment.

decisions, discussed *infra*, in which courts have found that the assignment of legal malpractice actions would adversely affect attorney-client relations and, by necessary implication, the legal system.

In opposition to this argument, MNC contends that Virginia public policy, as expressed in Virginia Code § 8.01-26, directs that all contract actions, including legal malpractice actions, are assignable. Secondly, MNC advocates the adoption of the rule adhered to by a minority of American jurisdictions that legal malpractice actions do not contravene public policy in the event the assignee has a significant relationship to the matter out of which the legal malpractice claim arose. In this case, MNC maintains that MNMC's claim is assignable because MNC is a sister corporation to MNMC and was always a potential assignee.

The issue of whether legal malpractice claims may properly be assigned is one of first impression in Virginia.

### (a) *Virginia Code § 8.01-26*

Virginia Code § 8.01-26, in pertinent part, provides as follows:

> Only those causes of action for damage to real or personal property, whether such damage be direct or indirect, and causes of action ex contractu are assignable.

MNC argues (i) that § 8.01-26 makes plain that it is the public policy of Virginia that all contract actions are assignable; and (ii) since legal malpractice actions are contractual in nature, *Olyear v. Kerr, Trustee,* 217 Va. 88 (1976), they are assignable.

I disagree. It is arguable that from its plain meaning, two interpretations of Virginia Code § 8.01-26 can be advanced. One is that advocated by MNC: that the statute provides that all contract actions are assignable. The second, however, is that the statute merely creates two classifications: those actions which are potentially assignable, and those which may not be assigned. Pursuant to this interpretation, "[o]nly" actions for breach of contract and actions for injury to property are potentially assignable, but all such actions are not necessarily assignable.

It is a well-recognized rule of statutory construction that the legislature is presumed to know and to legislate with a view to existing law. *Cape Henry Towers v. National Gypsum Co.,* 229 Va. 596 (1985). Furthermore, courts will not gratuitously accept statutory interpretations which give rise to fanciful or unreasonable results. *Buzzard v. Commonwealth,* 134 Va. 641 (1922).

MNC's construction of Virginia Code § 8.01-26 leads to such an illogical result. Assignments are a creature of contract. It makes no sense to assume that the General Assembly, knowing that contracts violating public policy are deemed unenforceable, intended to make an exception for assignments of such contract actions. Therefore, a more reasonable interpretation is to be preferred. *See, Southern Ry. v. Commonwealth,* 205 Va. 114, 119 (1964) ("we are required to give to the statute a reasonable construction — one which will, if possible, give effect to its obvious purpose.") The purpose of enacting Virginia Code § 8.01-26 was to express the Commonwealth's general policy that contract actions may be assigned. However, there is no indication that the General Assembly intended to alter the established rule that contracts violating public policy are unenforceable.

Since Virginia Code § 8.01-26 does not validate the assignment of contracts which violate public policy, the question becomes whether assignments of legal malpractice actions violate public policy.[5]

### (b) *Virginia Public Policy: Attorney-Client Relationships*

Expressions of Virginia public policy relating to the attorney-client relationships are primarily contained in the Rules of the Virginia Supreme Court which are issued by authority of the General Assembly. *See,* Va. Code § 54.1-3909, et seq. For example, the Introduction to Part 6, Section I of the Rules of Court emphasizes that "[t]he relation of attorney and client is direct and personal." Virginia Code of Professional Responsibility, Introduction (1983). Disciplinary Rule 4 of the Virginia Code of Professional Responsibility, furthermore, requires attorneys to protect the confidences and secrets of their clients. *Id.* at DR 4. And Ethical Consideration 4-1,[6] relating to that disciplinary rule, emphasizes:

---

[5] MNC also contends Virginia Code § 8.01-13 reflects a public policy favoring the assignment of contract actions, including the assignment of legal malpractice claims. This statute, however, does not address the question here. It simply stipulates that assignees of claims can sue in their own names. This statute is irrelevant to the issue at hand.

[6] Pursuant to Virginia Code § 54.1-3909, the Virginia General Assembly authorized the Supreme Court of Virginia to promulgate rules and regulations prescribing a code of ethics to govern the practice of law. In achieving such a purpose, the Supreme Court of Virginia is also granted the power to organize and govern the Virginia State Bar. Va. Code § 54.1-3910. Pursuant to Part 6, Section IV, of the Rules of the Virginia Supreme Court, the Virginia State Bar is granted the authority to draft and approve Ethical Considerations to the Virginia Code of Professional Responsibility.

> Both the fiduciary relationship existing between lawyer and client and the proper functioning of the legal system require preservation by the lawyer of confidences and secrets of one who has employed or sought to employ him.

*Id.* at EC 4-1.

The Rules of Court also reflect strong public policy that attorneys provide legal services to the disadvantaged. *See, Id.* at EC 2-1.[7] The propriety of contingent fees is primarily justified on this basis. *See, Id.,* at EC 2-22.

From the foregoing, it is evident that Virginia public policy favors the promotion, protection, and preservation of confidential and personal relationships between clients and their attorneys. Virginia's public policy, presumably, is not different from statutes or rules governing the practice of law in other American jurisdictions. Therefore, in addressing the question of whether the promotion of confidential, fiduciary, and highly personal attorney-client relations is adversely affected by the assignability of legal malpractice claims, it is useful to evaluate how other courts have reconciled this interest with a more general interest of freedom to contract. As suggested above, American jurisdictions considering this issue have reached divergent conclusions.

### (c) *Decisions from Other Jurisdictions*

### (i) *The Majority Rule*

A majority of American jurisdictions considering whether legal malpractice claims may be assigned have adopted a bright line rule: assignments of such claims violate public policy and are unenforceable. *See, Goodley v. Wank & Wank, Inc.,* 133 Cal. Rptr. 83 (1976); *Christison v. Jones,* 405 N.E.2d 8 (Ill. App. 1980); *Joos v. Drillock,* 338 N.W.2d 736 (Mich. App. 1983); *Schroeder v. Hudgins,* 690 P.2d 114 (Ariz. App. 1984); *Washington v. Fireman's Fund Ins. Co.,* 459 So. 2d 1149 (Fla. App. 4 Dist. 1984); *Layman v. Layman,* 578 A.2d 314 (Md. App. 1990). These majority rule courts emphasize the personal nature of the attorney-client relationship and the potentially corrosive effects on such relationships if legal malpractice claims are to be freely alienable.

---

[7] "The need of members of the public for legal services is met only if they ... are able to obtain the services of acceptable legal counsel ... . Hence, [an important function] of the legal profession [is] ... to assist in making legal services fully available." Virginia Code of Professional Responsibility EC 2-1 (1983).

*Goodley v. Wank & Wank, Inc.*, 133 Cal. Rptr. 83 (1976); *Christison v. Jones*, 405 N.E.2d 8 (Ill. App. 1980); *Joos v. Drillock*, 338 N.W.2d 736 (Mich. App. 1983). Some have additionally stressed that the transferability of such claims will also discourage attorneys from accepting representation of the disadvantaged. *Goodley v. Wank & Wank*, 133 Cal. Rptr. 83 (1976).

The leading case in favor of the majority rule is the decision of the California Court of Appeals for the Second District in *Goodley v. Wank & Wank, Inc.*, 133 Cal. Rptr. 83 (1976). In that decision, Associate Justice Lillie wrote:

> It is the unique quality of legal services, the personal nature of the attorney's duty to the client, and the confidentiality of the attorney-client relationship that invoke public policy considerations in our conclusion that malpractice claims should not be subject to assignment. The assignment of such claims could relegate the legal malpractice action to the market place and convert it to a commodity to be exploited and transferred to economic bidders who have never had a professional relationship with the attorney and to whom the attorney has never owed a legal duty, and who have never had any prior connection with the assignor or his rights. The commercial aspect of assignability of choses in action arising out of legal malpractice is rife with probabilities that could only debase the legal profession. The almost certain end result of merchandizing such causes of action is the lucrative business of factoring malpractice claims which would encourage unjustified lawsuits against members of the legal profession, generate an increase in legal malpractice litigation, promote champerty, and force attorneys to defend themselves against strangers. The endless complications and litigious intricacies arising out of such commercial activities would place an undue burden on not only the legal profession but the already overburdened legal system, restrict the availability of competent legal services, embarrass the attorney-client relationship and imperil the sanctity of the highly confidential and fiduciary relationship existing between the attorney and client ... .
>
> [T]he ever present threat of assignment and the possibility that ultimately the attorney may be confronted with the necessity of defending himself against the assignee of an irresponsible client who, because of dissatisfaction with legal services rendered and out of resentment and/or for monetary gain, has discounted a purported claim for malpractice by assigning the same, would most surely result in a

selective process for carefully choosing clients thereby rendering a disservice to the public and the profession.

*Id.* at 87.

In *Goodley*, Judge Lillie emphasized two unfavorable consequences in permitting the assignment of legal malpractice actions. The first is that a client's ability to assign a legal malpractice claim to anyone with the resources and inclination to convert that claim to monetary advantage threatens the confidential nature of attorney-client relationship. The second is that attorneys will be encouraged to evade the aspirational credo of furnishing legal services to the disadvantaged. Judge Lillie's analysis makes plain that the assignment of legal malpractice claims can be expected to undermine the personal, confidential nature of attorney-client relations and, by implication, that those deleterious effects outweigh the benefits of the free alienability of such choses in action.

#### (ii) *The Minority Rule*

A fewer number of American jurisdictions have adopted a rule validating assignments of legal malpractice claims in various circumstances. MNC relies principally on three decisions holding that legal malpractice claims may be assigned if the assignee has "an intimate connection" with the subject matter giving rise to the malpractice claim. The first of these three decisions is *Hedlund Mfg. Co. v. Spivak*, 539 A.2d 357 (Pa. 1988). This case arose out of the sale to Hedlund Manufacturing Company of supposedly patented machinery. When it was discovered that the patent was not protected due to the failure of the seller's attorney to timely apply for a patent, the seller assigned his legal malpractice action to Hedlund. In validating that assignment, the Pennsylvania Supreme Court treated the assignability issue as a mechanical determination of whether malpractice claims constituted a personal or pecuniary action. (Pennsylvania had outlawed the former but not the latter.) The Pennsylvania Supreme Court concluded that legal malpractice actions, being contractual in nature, involved injuries which "[concerned] purely pecuniary interests," and as such, were properly assignable. *Id.* at 359.

In reaching its decision, the Pennsylvania Supreme Court virtually ignored Justice Lillie's public policy analysis in *Goodley*. Although the Pennsylvania Supreme Court cited *Goodley*, it was content to distinguish the California decision as follows:

> We will not allow the concept of the attorney-client relationship to be used as a shield by an attorney to protect him or her from the consequences of legal malpractice. Where the attorney has caused harm to his or her client, there is no relationship that remains to be protected.

*Id.* This observation is not only unduly brief but fails to recognize that an injured client maintains the right to sue a professionally negligent attorney.

MNC secondly relies upon *Thurston v. Continental Cas. Co.*, 567 A.2d 922 (Me. 1989), in which a products liability defendant suffered an adverse judgment, due in part to the alleged incompetence of his attorney and sought to satisfy the judgment by assigning his malpractice claim to the plaintiff-judgment creditor. Relying exclusively on *Hedlund*, the Maine Supreme Court held legal malpractice claims might be assigned if the assignee had "an intimate connection with the underlying lawsuit." *Id.* at 923. While finding that the plaintiff-assignee had such an intimate relationship, the Maine Supreme Court failed to articulate what did and did not constitute "an intimate connection with the underlying lawsuit" except to observe that it perceived no detriment from an assignment to one "with a clear interest in the claim who also had the time, energy, and resources to bring suit." *Id.* As in *Hedlund*, the Maine Court failed to address the public policy analysis in *Goodley* and its progeny.

Finally, MNC points to *Richter v. Analex Corp.*, 940 F. Supp. 353 (D. D.C. 1996), in which a federal judge recognized the assignment of a legal malpractice claim from one corporation to another. Although the relationship between the companies involved was not clear from the district judge's opinion, the interests of both corporations were inferably affected by the attorney's services and alleged professional errors or omissions. Relying on *Hedlund* and *Thurston*, the district court enigmatically held that the assignor corporation's cause of action for the attorney's putative malpractice was assignable "in circumstances such as these." 940 F. Supp. at 358.

### (d) *Analysis*

The public policy justifications offered by Justice Lillie and the other majority rule courts present compelling reasons to restrict those who may litigate legal malpractice claims to the parties to the original attorney-client relationship. Otherwise, as pointed out by Justice Lillie, in such an overly commercial (and arguably less professional) environment in which legal malpractice claims might be bought and even sold by strangers to the attorney-

client relationship, it is foreseeable that transactions involving sales of such claims will be made with one calculus in mind: the risk-reward ratio. It is also reasonably foreseeable that decisions of whether or not to undertake the representation of a particular client will hinge more heavily on the fees to be received and the risk of liability to strangers to the attorney-client relationship. Moreover, these and similar considerations will inevitably affect the candor with which attorneys deal with their clients. While the extent of these and other adverse effects may be subject to dispute, the foreseeability of such adverse effects cannot reasonably be doubted.

MNC has commended the *Hedlund-Thurston-Analex Corp.* triad of decisions to this court, contending that legal malpractice claims should be assignable if assigned to persons with an "intimate connection" with the matter out of which the malpractice claim arose. However, after closely studying these decisions, I find the minority rule unpersuasive. The minority courts, in reaching their respective decisions, have almost wholly failed to recognize the gravity of the consequences of adopting a rule permitting the assignability of attorney malpractice claims. Nor have they advanced a reasoned basis why a rule of limited assignability of such claims should be adopted. Nor have they presented any rationale as to the scope of such a limited rule, i.e., when a potential assignee would have "an intimate connection" with the subject of legal representation so that a legal malpractice claim might be assigned.[8] I therefore find these minority rule cases unpersuasive.

For the reasons expressed, I reject the notion that Virginia Code § 8.01-26 was intended to validate the assignability of legal malpractice claims. And, I conclude that such assignments violate Virginia's public policy encouraging the promotion, protection, and preservation of confidential and personal attorney-client relations and are therefore unenforceable.

## III. *Decision*

The Attorneys' demurrer to MNC's First Amended Bill of Complaint is sustained without leave to amend.

---

[8] Indeed, *Thurston* appears to hold that a sufficient "intimate connection" is established between a plaintiff and defendant whereby defendant's claim for legal malpractice may be assigned if the basis of that legal malpractice claim were mistakes made by defendant's trial counsel eventuating in an adverse judgment. Such a policy, however, creates a strong incentive for disappointed litigants to assign malpractice claims to successful plaintiffs in partial or total satisfaction of adverse judgments. Palpably, such assignments would encourage litigation in courts which are already overburdened by suits filed by overly litigious parties.